958 F.Supp. 1550 (1997)
Michael CHANDLER, et al., Plaintiffs,
v.
Forrest H. "Fob" JAMES Jr., et al., Defendants.
Civil Action No. 96-D-169-N.
United States District Court, M.D. Alabama, Northern Division.
March 12, 1997.
*1551 *1552 Steven Green, Americans United for Separation of Church and State, Washington, DC, Stephen L. Pevar, American Civil Liberties Union Foundation, Denver, CO, Pamela L. Sumners, American Civil Liberties Union of Alabama, Elizabeth Joy Hubertz, Levin, Middlebrooks, Mabie, Thomas, Mitchell, Papantonio, Birmingham, AL, James A. Tucker, Alabama Civil Liberties Union, Montgomery, AL, for Michael Chandler, Jane Doe.
Alan Eric Johnston, Johnston, Trippe & Brown, Birmingham, AL, William P. Gray, Jr., Legal Advisor to the Governor, Governor's Office, State Capitol, Montgomery, AL, for Fob James, Jr.
Jeffery Harris Long, Thomas F. Parker, IV, Deputy Atty. Gen., Office of Attorney General, Montgomery, AL, for Jeff Sessins.
Denise Boone Azar, Ashley H. Hamlett, Dept. of Education, Office of General Counsel, *1553 Montgomery, AL, for Ed Richardson, Bradley Byrne, G. J. Higginbotham, Stephanie Bell, Ethel Hall, Willie Paul, David Byers, Jr., Sandra Ray, Mary Jane Caylor.
Donald B. Sweeney, Jr., David P. Condon, Rives & Peterson, Birmingham, AL, Oakley W. Melton, Jr., James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Weldon Parrish, Jimmy Wilbanks, Johnny Young, Mary Etta Bailey, Willard A. Israel, Tommie Johnson.
Mark A. Rasco, Ralph Gaines, Gaines, Gaines & Rasco, P.C., Talladega, AL, J. Allen Schreiber, Gerald Alan Templeton, Lloyd, Schreiber & Gray, P.C., Birmingham, AL, James Eugene Williams, Melton, Espy, Williams & Hayes, P.C., Montgomery, AL, for Charles E. Kearley, James Braswell, T. Y. Lawrence, Jr., Bonnie Miller, Michael O'Brien, Helen Scales.

MEMORANDUM OPINION AND ORDER
DE MENT, Judge.
In 1977, the Alabama legislature passed the first in a series of "school prayer" statutes. This first statute, which provided for a moment of silence at the beginning of the school day, see Ala.Code § 16-1-20 (1995), was supplemented in 1981 by a statute which specifically provided that the moment of silence "shall be observed for meditation or voluntary prayer." Ala.Code § 16-1-20.1 (1995). Then, in 1982, a third school prayer statute was passed which "recogniz[ed] that the Lord God is one" and permitted public school teachers to lead willing students in a specified prayer. Ala.Code § 16-1-20.2 (1995). Both the 1981 and 1982 statutes were struck down because they violated the Establishment Clause of the First Amendment to the United States Constitution. See Jaffree v. Wallace, 705 F.2d 1526, 1535-36 (11th Cir.1983), aff'd, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (section 16-1-20.1); Jaffree v. Wallace, 705 F.2d 1526, 1535-36 (11th Cir.1983), aff'd, 466 U.S. 924, 104 S.Ct. 1704, 80 L.Ed.2d 178 (1984) (section 16-1-20.2).
In 1993 the Alabama Legislature enacted a fourth statute. The operative portion of § 16-1-20.3 reads:
(b) On public school, other public, or other property, non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions, shall be permitted during compulsory or non-compulsory school-related student assemblies, school-related student sporting events, school-related graduation or commencement ceremonies, and other school-related student events.
Ala.Code § 16-1-20.3(b) (1995). In 1996, the plaintiffs filed this suit asserting, among other things, that § 16-1-20.3 is facially unconstitutional. Thus, the Court must decide whether this latest school prayer statute has been cured of the infirmities that rendered its predecessors unconstitutional.
To begin, the Court will review the landscape of Establishment Clause jurisprudence as it relates to public schools in order to provide a context for the Court's discussion of the statute at issue. Religion has been, and continues to be, an important part of many Americans' public and private lives. See School Dist. of Abington Township, Pennsylvania v. Schempp, 374 U.S. 203, 212-13, 83 S.Ct. 1560, 1565-67, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 433-35, 82 S.Ct. 1261, 1268-69, 8 L.Ed.2d 601 (1962); Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 683-84, 96 L.Ed. 954 (1952). The pervasiveness of religion in this country is apparent from its frequent manifestation in public lifefrom prayers marking the opening of Congress and many state legislatures, see Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), to the affirmation found on our legal currency, to the oaths of office taken by many of our publicly elected officials. See Schempp, 374 U.S. at 213, 83 S.Ct. at 1566-67 (noting various examples of religious affirmations in public life); see also E. Gregory Wallace, When Government Speaks Religiously, 21 Fla. St. L.Rev. 1183, 1183-1185 (1994) (same).
It was devout religious conviction which led many colonists to leave England and settle in America. Unwilling to suffer the state-sponsored Church of England, many settlers came to this country in search of the right to freely exercise their religious beliefs to be free from state-established religion. *1554 See Engel, 370 U.S. at 434, 82 S.Ct. at 1269. Eventually, these rights were memorialized in the First Amendment to the Constitution: "Congress shall make no law respecting an establishment of religion," (the Establishment Clause) "or prohibiting the free exercise thereof" (the Free Exercise Clause). U.S. Const. amend. I.[1]
The right to be free from state-established religion lies at the heart of the concept of "freedom of religion." See Lee v. Weisman, 505 U.S. 577, 591, 112 S.Ct. 2649, 2657-58, 120 L.Ed.2d 467 (1992) ("the Framers deemed religious establishment antithetical to the freedom of all"). It has been said that nothing short of a "wall of separation between church and state" can adequately safeguard our religious freedom. See Everson v. Board of Educ. of Ewing, 330 U.S. 1, 16-18, 67 S.Ct. 504, 511-13, 91 L.Ed. 711 (1947). While this wall may be more metaphor than mortar, see Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) ("far from being a `wall,' [the Establishment Clause] is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship"), the concept continues to be a useful one as the separation of church and state is fundamental to the preservation of our pluralistic society.
The framers codified at least two purposes when they enacted the Establishment Clause. "Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion." See Engel, 370 U.S. at 431, 82 S.Ct. at 1267. Although frequently touted as a telic tool used by religious dissenters, the Establishment Clause is properly seen as an essential safeguard for the sanctity of religious belief. James Madison acknowledged this when he stated, "`[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation.'" Lee v. Weisman, 505 U.S. 577, 590, 112 S.Ct. 2649, 2657, 120 L.Ed.2d 467 (1992) (quoting James Madison's Memorial and Remonstrance Against Religious Assessments (1785), in 8 Papers of James Madison, 301 (W. Rachal et al. eds. 1973)). While government support of religion may, for the benefitted believer, have an initial appeal, this support ultimately leads to governmental influence and a concomitant erosion of religious tenets. For this reason, "[i]t is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government." Schempp, 374 U.S. at 259, 83 S.Ct. at 1591 (Brennan J. concurring).
Second, by enacting the Establishment Clause, the framers sought to prevent the political persecution of those people of a minority faith. See Engel, 370 U.S. at 431, 82 S.Ct. at 1267. Religious faith can be a powerfully divisive force. See Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 382, 105 S.Ct. 3216, 3221, 87 L.Ed.2d 267 (1985) ("[J]ust as religion has provided spiritual comfort, guidance, and inspiration to many, it can also serve powerfully to divide societies and to exclude those whose beliefs are not in accord with particular religions or sects that have from time to time achieved dominance."). While our political system is founded on majoritarian principles, freedom of religious belief was deemed too important to be subject to the whim of the majority. See Schempp, 374 U.S. at 226, 83 S.Ct. at 1573 (a majority cannot "use the machinery of the state to practice its [religious] beliefs"); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."). The Establishment Clause *1555 prevents one's religious beliefs from being made relevant to one's standing in the political community. See Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984) (O'Connor, J. concurring).
The Establishment Clause works together with the Free Exercise Clause to protect our religious freedom. As discussed above, the Establishment Clause prevents the majority from legislating preferential treatment for those of a particular religious faith. In turn, the Free Exercise clause insures that government will not unduly burden the practice of any religious faith. See e.g Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993); Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) ("If the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid."). Together, "[t]he First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the state." Lee, 505 U.S. at 589, 112 S.Ct. at 2656.
Although the Establishment Clause works with the Free Exercise Clause to fully safeguard our religious freedom, there is an inherent tension between the two clauses. See Walz v. Tax Comm'n, 397 U.S. 664, 668-69, 90 S.Ct. 1409, 1411-12, 25 L.Ed.2d 697 (1970). If the Free Exercise Clause were interpreted as an absolute mandate, it would subsume the Establishment Clause. Id. Paradoxically, making "Free Exercise" an absolute mandate would, for all the reasons discussed above, effectively destroy "freedom of religion" as we know it.
The Free Exercise Clause does, however, contain an absolute component: freedom of belief. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The government can never take action which has the effect of proscribing or prescribing a belief. Thus, in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, the Supreme Court declared unconstitutional a resolution which required students to salute and "pledge allegiance" to the flag of the United States or face expulsion and other punitive measures.[2] The Court stated, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id. at 642, 63 S.Ct. at 1187.
Although the Free Exercise Clause guarantees complete freedom of belief, the guarantee does not extend to protect all religious activity. Cantwell, 310 U.S. at 303-04, 60 S.Ct. at 903-04 ("[T]he [First] Amendment embraces two concepts,freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."). If the Free Exercise Clause protected all religious activity, it would not be possible to maintain a civil, pluralistic society. To take an obvious example, consider a religion which required adherents to make human sacrifices; while the Free Exercise Clause protects the right to ascribe to such a faith, it would not protect believers who acted in accordance with such tenets. See Employment Div. Dept. of Human Resources v. Smith, 494 U.S. 872, 882-90, 110 S.Ct. 1595, 1601-06, 108 L.Ed.2d 876 (1990). Similarly, it is easy to see how the absolute protection of religious activity would quickly lead to an establishment of religion. If a school principal's religious beliefs commanded him or her to "save" others and taught him or her that other religions were false, he or she might consider it his or her religious duty to "establish" his or her religion in that particular school.[3] And, if the Free Exercise Clause *1556 were an absolute, the principal would have a constitutional right to press his or her religious views on students through official school channels. Clearly, the Free Exercise Clause cannot be interpreted as an absolute mandate.
What then do these complementary, yet competing, clauses (Establishment and Free Exercise) require? They require government to remain strictly neutral both among religions and between religion and non-religion. County of Allegheny, 492 U.S. at 590-91, 109 S.Ct. at 3099-3100; Ball, 473 U.S. at 381-82, 105 S.Ct. at 3221-22; Jaffree, 472 U.S. at 60, 105 S.Ct. at 2491-92; Epperson v. Arkansas, 393 U.S. 97, 103-04, 89 S.Ct. 266, 269-70, 21 L.Ed.2d 228 (1968); Jager v. Douglas County Sch. Dist., 862 F.2d 824, 828 (11th Cir.1989), cert. denied, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989). It is the job of the judiciary to insure that governments do not run afoul of this command of neutralityto insure that government takes no action which favors or disfavors religion or religious belief. See County of Allegheny, 492 U.S. at 592-93, 109 S.Ct. at 3100-01; Barnette, 319 U.S. at 638, 63 S.Ct. at 1185.
Courts must perform this task with added vigilance when governments take action affecting our public schools. "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." Edwards v. Aguillard, 482 U.S. 578, 584, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987). School children are particularly susceptible to peer pressure and other forms of direct or indirect coercion. See Ball, 473 U.S. at 383, 105 S.Ct. at 3222 ("the government's activities in [public schools] can have a magnified impact on impressionable young minds"). Furthermore, school attendance is mandatory, and while in school, students' expressive behavior is strictly regulated. When prayer is introduced into a public school curriculum, students who find the particular prayer, or prayer in general, offensive cannot express their dissent by "walking away" or verbally objecting. See Lee, 505 U.S. at 592-94, 112 S.Ct. at 2658-59; Edwards, 482 U.S. at 584, 107 S.Ct. at 2577-78; c.f. Marsh, 463 U.S. at 792, 103 S.Ct. at 3336 (allowing prayer to open session of state legislature in part because those in attendance are free to enter and leave). In the sensitive setting of our public schools, "[w]hat to most believers may seem like nothing more than a reasonable request that the nonbeliever respect their religious practices [] may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." Lee 505 U.S. at 592, 112 S.Ct. at 2658. Thus, what is permissible religious expression or activity in some settings, is regularly held to violate the mandate of neutrality towards religion in our public schools. See, e. g., Doe v. Duncanville Ind. Sch. Dist., 70 F.3d 402, 406-07 (5th Cir.1995) (prayer at high school basketball game unconstitutional); Berger v. Rensselaer Central Sch. Corp., 982 F.2d 1160, 1170-71 (7th Cir. 1993) (distribution of Gideon's Bibles in public school unconstitutional), cert. denied, 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993); Jager, 862 F.2d at 830-32 (prayer at high school football games unconstitutional); see also Jonathon C. Drimmer, Hear No Evil, Speak No Evil: The Duty of Public Schools to Limit Student-Proposed Graduation Prayers, 74 Neb. L.Rev. 411, 419-20 (1995) (interpreting the principle of "neutrality" in the public school setting to "require[] an active participation by the schools to guarantee that religion remain absent from school-sponsored events").
Moreover, in the public school setting, federal courts have repeatedly struck down legislation and practices permitting prayer even when the prayer at issue was ostensibly "voluntary" or "student-initiated." For example, in Engel v. Vitale, the Supreme Court declared unconstitutional a school district's practice of having students recite aloud a non-denominational prayer even though students were free to elect not to participate. 370 U.S. at 423-24, 82 S.Ct. at 1263. The Court stated:

*1557 The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not.... When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect pressure upon religious minorities to conform to the prevailing officially approved religion is plain.
Id. at 430-31, 82 S.Ct. at 1267; see also Lee, 505 U.S. at 599, 112 S.Ct. at 2661-62; Schempp, 374 U.S. at 224-25, 83 S.Ct. at 1572-73; Jager, 862 F.2d at 832. Similarly, because the resources and facilities of the state are utilized when a "student-initiated" prayer is given in public schools, those hearing the prayer may be led to believe the state is associated with or endorses either the speaker's religion, or religion over non-religion. Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 279 (5th Cir.1996), cert. denied, ___ U.S. ____, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996); American Civil Liberties Union v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1479-80 (3d Cir.1996); Herdahl v. Pontotoc County Sch. Dist., 887 F.Supp. 902, 908 (N.D.Miss.1995); Gearon v. Loudoun County Sch. Bd., 844 F.Supp. 1097, 1099 (E.D.Vir.1993); but see Jones v. Clear Creek Ind. Sch. Dist., 977 F.2d 963 (5th Cir.1992), cert. denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993).[4]
*1558 Over the years, the Supreme Court has developed a number of principles designed to aid the courts in their task of insuring government neutrality towards and among religions. In Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court identified "the three main evils against which the Establishment Clause was intended to afford protection: `sponsorship, financial support, and active involvement of the sovereign in religious activity.'" Id. at 612, 91 S.Ct. at 2111 (quoting Walz v. Tax Commission, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). To determine whether a practice or legislation implicates any of these evils, the Lemon court summarized the Court's Establishment Clause jurisprudence into three tests: (1) does the statute have a secular purposes[5]; (2) is the principal or primary effect of the statute to advance or inhibit religion; and (3) does the statute foster excessive entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111.[6] If the answer to any of these questions is "yes," then the legislation in question has violated the principle of government neutrality towards and among religions, and is unconstitutional. Id. at 613-14, 91 S.Ct. at 2111-12; Jager, 862 F.2d at 828.
The Supreme Court has since decided a number of cases wherein they have supplemented the tripartite Lemon test. In her concurrence in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Justice O'Connor attempted to refine the "purpose" and "effect" prongs of the Lemon test. According to Justice O'Connor, the relevant inquiry is whether the challenged government activity has either the purpose or effect of endorsing or disapproving religion. Id. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). To make this inquiry, courts must "examin[e] ... both the subjective and objective components of the message communicated by a government action." Id. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). Such an inquiry helps identify those governmental activities which "intentionally or unintentionally [] make religion relevant, in reality or public perception, to status in the political community." Id. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). It is these governmental activities that the Establishment Clause intended to strictly prohibit. Id. at 687-88, 104 S.Ct. at 1366-67 (O'Connor, J., concurring); see generally Joel S. Jacobs, Endorsement as "Adoptive Action:" A Suggested Definition of, and an Argument for, Justice O'Connor's Establishment Clause Test, 22 Hastings Const. L.Q. 29 (1994). While Justice O'Connor's revision of the Lemon test was not adopted by the entire Court, it has frequently proven useful in the Court's analysis of religion cases. See, e.g., County of Allegheny, 492 U.S. at 592-93, 109 S.Ct. at 3100-01 (Justice O'Connor's analysis "provides a sound analytical framework for evaluating religious symbols."); Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 17, 109 S.Ct. 890, 900-01, 103 L.Ed.2d 1 (1989); Ball, 473 U.S. at 389, 105 S.Ct. at 3225-26; Jaffree, 472 U.S. at 60, 105 S.Ct. at 2491-92.
After Lynch, the Court decided Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). In Lee, the Court observed, "[i]t is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which `established a state religion or religious faith, or tends to do so.'" Id. at 587, 112 S.Ct. at 2655 (quoting Lynch, 465 U.S. at 678, 104 S.Ct. at 1361-62). For a practice to have a coercive effect, and thus be unconstitutional, it need not involve direct coercion in the form of a threatened penalty or legal sanction. See id. at 592-95, 112 S.Ct. at 2658-60. Rather, indirect coercion such as peer pressure will suffice. Id. at 592-93, 112 S.Ct. at 2658-59. Consequently, in Lee, the Court struck down a school's *1559 practice of providing a clergyman to deliver a non-sectarian benediction at a high school graduation because students could be pressured by their peers to actually or symbolically participate in the prayer against their wishes. Id. at 593, 112 S.Ct. at 2658-59.
While the principles discussed in the foregoing cases, Lemon, Lynch and Lee, help guide the Court's analysis, there remains an abstract quality about these principles such that prohibited and acceptable religious activity in public schools is not always readily discernible. There are however, a number of activities which clearly fall on one side of the line or the other. It will be helpful to review these activities before the Court turns to the constitutionality of the statute at issue.
Acknowledging the significant and pervasive role of religion throughout our history, the Supreme Court has repeatedly stated that religion can and should play a role in our public schools' curriculum. Over the centuries, religion has been the dominant developmental force in the humanitiesart, music, literature and the other humanities. The Establishment Clause does not prevent children who attend public schools from learning about these subjects nor from learning about the influence of religion on these subjects. See Edwards v. Aguillard, 482 U.S. at 607-08, 107 S.Ct. at 2590-91 (Powell, J., concurring). Moreover, "the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." Stone v. Graham, 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980). "The Establishment Clause is properly understood to prohibit the use of the Bible and other religious documents in public school education only when the purpose of the use is to advance a particular religious belief." Aguillard, 482 U.S. at 608, 107 S.Ct. at 2590-91 (Powell, J., concurring).
As noted earlier, the Free Exercise Clause protects absolutely the right to believe whatever we choose. This right, coupled with our right to freedom of speech found in the First Amendment[7], allows people to espouse their beliefs, including their religious beliefs, in any "public forum"[8] limited only by reasonable time, place and manner restrictions. See United States Postal Serv. v. Council of Greenburgh Civic Assns., 453 U.S. 114, 132, 101 S.Ct. 2676, 2686-87, 69 L.Ed.2d 517 (1981). Children attending public school are "Constitutional people," possessed of Constitutional rights and entitled to Constitutional protections. See In re Gault, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967) ("[N]either the Fourteenth Amendment nor the bill of Rights is for adults alone."); Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969) ("Students in school as well as out of school are `persons' under our Constitution."). Therefore, subject to the limitations discussed below, children attending public school have the right to espouse their religious beliefs.
The Court's acknowledgment of this right, while intended to be informative, is also dispositive of the issue at hand, the constitutionality of Ala.Code § 16-1-20.3. Section 16-1-20.3(b) provides that public school students may engage in student-initiated, non-sectarian[9], non-proselytizing[10] prayer during compulsory and non-compulsory school-related events. According to the statement of purpose found in subsection (a), the statute is intended "to provide guidance to public school officials on the rights and requirements of the law." Ala.Code § 16-1-20.3(a). In an effort to assure the public and the courts that the statute does not diminish generally the constitutional rights of public *1560 school students, and thus "save" the statute, the Alabama legislature added subsection (c) which states that the statute "shall not diminish the right of any student or person to exercise his or her rights of free speech and religion ... at times or events other than those stated in subsection (b)." Ala.Code § 16-1-20.3(c) (emphasis added).[11] The "times and events" referred to in subsection (c) are "compulsory or non-compulsory school-related student assemblies, school-related student sporting events, school-related graduation or commencement ceremonies, and other school-related student events." Ala.Code § 16-1-20.3(b). That is, subsection (c) assures the public that the statute has no effect on the constitutional rights of public school students, including the rights of free speech and prayer, except during the times and events enumerated in subsection (b). Regrettably, instead of "saving" the statute, subsection (c) highlights the impermissible effect of the statutethe statute diminishes public school students' free speech and prayer rights during the times and events listed in subsection (b).
The Alabama legislature has defined its public school students' free speech and prayer rights too narrowly. To the extent that students' free speech rights attach, they are free to engage in sectarian, proselytizing religious speech. The legislature's effort to limit the application of the statute's constrictive definition of public school students' free speech and prayer rights to "school-related student events" fails to affect the Court's analysis. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker, 393 U.S. at 506, 89 S.Ct. at 736. Accordingly, the Court finds that § 16-1-20.3 is unconstitutional because it infringes public school students' free speech and prayer rights.[12]
The Establishment Clause does not forbid private sectarian,[13] proselytizing speech. In fact, the Establishment Clause has no bearing at all on private speech. The Establishment Clause operates only on government or state-sponsored speech, and then, prohibits all religious speech, not only sectarian, proselytizing religious speech. See, e.g., Lee, 505 U.S. at 588-89, 112 S.Ct. at 2655-56 (forbidding state-sponsored non-sectarian prayer); Engel, 370 U.S. at 430, 82 S.Ct. at 1266-67 (same); Ingebretsen, 88 F.3d at 279-80 (holding unconstitutional statute which permits student-initiated, non-sectarian, non-proselytizing prayer in public school). This is so because, in addition to forbidding the government from favoring one religion over another, the Establishment Clause forbids the government from favoring religion over non-religion. E.g. Jaffree, 472 U.S. at 53, 105 S.Ct. at 2487-88 ("the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all"); Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A *1561 1981), aff'd, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982).[14]
Thus, § 16-1-20.3 is fatally flawed in that it defines students' free speech and religion rights too narrowly. When these rights attach to students in school, they may engage in sectarian, proselytizing religious speech. And, of course, it is the duty of this Court and all other courts to protect these constitutional rights when and if they are impinged. There are, however, some limitations on the rights of students to engage in speech of any type while they are in school.
In Tinker, the Supreme Court recognized that public school students have free speech rights. See 393 U.S. at 511, 89 S.Ct. at 739. However, the Court noted that "conduct by the student, in class or out of it, which for any reasonwhether it stems from time, place, or type of behaviormaterially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513, 89 S.Ct. at 740. In Bethel School District Number 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Court expounded on the limitations on students' free speech rights. The Court held that the free speech rights of students in school are not co-extensive with the free speech rights of adults. Id. at 682, 106 S.Ct. at 3163-64 (citing New Jersey v. T.L.O., 469 U.S. 325, 340-42, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720 (1985)). The Court noted that while students were free to advocate political and religious views outside of school, this right is tempered during school by "the sensibilities of fellow students." Id. at 681, 106 S.Ct. at 3163; see also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988). The need to curtail controversial, disruptive or offensive speech is heightened when students are part of a "captive audience." See Fraser, 478 U.S. at 684, 106 S.Ct. at 3164-65. Thus, even though the Establishment Clause places no limitation on purely "private" speech, in school, a student's right to espouse his or her religious beliefs is limited by the foregoing principles.
Whether a student's free speech rights attach, such that he or she is able to freely espouse his or her religious beliefs, is necessarily a factual inquiry. It cannot be determined in the abstract whether a school has created a limited public forum, see Perry Educ. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46-47, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794 (1983) (making factual inquiry), such that a student's speech cannot be curtailed on the basis of content, see 20 U.S.C. §§ 4071-4074; Bd. of Educ. v. Mergens, 496 U.S. 226, 253, 110 S.Ct. 2356, 2373, 110 L.Ed.2d 191 (1990), or viewpoint, see Rosenberger v. Rector and the Visitors of the Univ. of Va., ___ U.S. ___, ___ _ ___, 115 S.Ct. 2510, 2516-17, 132 L.Ed.2d 700 (1995).[15] Nor can it be determined in the abstract whether a student's private religious speech is disruptive or impinges the rights of other students. However, school officials should be particularly wary of these dangers when a student advocates his or her religious beliefs in situations where the student's peers are unable to move about freely (and thereby avoid listening to speech they find disagreeable) and/or when the student's peers are unable to freely express themselves in response (because school officials are actively controlling a particular setting).[16]
While a determination of the scope of students' free speech rights requires the Court to make a factual inquiry, the Court notes that there are many forms of student religious expression which should, generally, be permissible. As long as students abide by *1562 a school's generally applicable rules and regulations, students should ordinarily be permitted to engage in the following forms of religious expression:[17]
(1) individual or group prayer or religious discussion outside of organized classes or school-sponsored events;
(2) reports, homework and artwork which reflect students' religious beliefs;
(3) distribution of religious literature (provided that the school generally permits students to distribute other literature not related to the school curriculum and that the religious literature is distributed in accordance with all applicable time, place and manner restrictions);
(4) display of religious symbols, articles and medals (e.g., Crosses, Stars of David, St. Christopher and other religious medals, even replicas of the Ten Commandments) and/or clothing bearing religious messages (provided that the school allows students to display non-religious expressive symbols and apparel and such display is in accordance with all applicable time, place and manner restrictions); and
(5) religious activity permitted by the Equal Access Act.[18] Additionally, students may pray silently at any time so long as it does not interfere with their school work.
In providing this list, the Court has attempted to illustrate generally permissible, private student religious expression. The Establishment Clause does not prohibit such expression. The Establishment Clause does, however, unequivocally prohibit state sponsored religious expression in public schools. The principles found in the cases discussed above, Lemon, Lynch and Lee, help the Court identify those situations which implicate this forbidden activity. With this in mind, the Court returns to the question of whether, on its face, § 16-1-20.3 of the Ala. Code is constitutional.
The first question a court must ask of challenged legislation is whether it was enacted for a secular legislative purpose. Lemon, 403 U.S. at 612, 91 S.Ct. at 2111. "In applying the purpose test, it is appropriate to ask `whether government's actual purpose it to endorse or disapprove of religion."' Wallace v. Jaffree, 472 U.S. at 56, 105 S.Ct. at 2489 (quoting Lynch, 465 U.S. at 690, 104 S.Ct. at 1368). While courts should normally be deferential to a legislature's stated purpose, the statement of such purpose must be sincere and not a sham. Edwards, 482 U.S. at 586-87, 107 S.Ct. at 2579-80.
Section 16-1-20.3(a) is a statement of legislative purpose. This section provides:
The legislative intent and purpose for this section is to protect the freedom of speech guaranteed by the First Amendment to the United States Constitution and Article 1, Section 4 of the Constitution of Alabama of 1901, to define for the citizens of Alabama the rights and privileges that are accorded them on public school and other public property and at school-related events, and to provide guidance to public school officials on the rights and requirements of law they must apply. Further, the intent and purpose of the Legislature is to properly accommodate the free exercise of religious rights of its student citizens in the public schools and at public school events as mandated by the First Amendment to the United States Constitution and the judicial interpretations thereof as given by the United States Supreme Court.
It is clear from this statement that the Alabama legislature sought to articulate a secular purpose for enacting § 16-1-20.3, and thus, distinguish this statute from its predecessor, § 16-1-20.1, which the Supreme Court held was not enacted for a secular *1563 purpose. Jaffree, 472 U.S. at 61, 105 S.Ct. at 2492. Section 16-1-20.1 provided that in public schools, at the beginning of each day, a moment of silence would be set aside for meditation or voluntary prayer. The statute's legislative history revealed that it was enacted to return voluntary prayer to Alabama's public schools. Id. at 56-58, 105 S.Ct. at 2489-91. This purpose was confirmed when the Court considered the statute's relationship to other state laws. Prior to enacting § 16-1-20.1, Alabama already had a law which set aside a moment of silence at the beginning of the school-day. See Ala.Code § 16-1-20. All that was added by enacting § 16-1-20.1 was to make explicit that the moment of silence could be used for voluntary prayer. Jaffree, 472 U.S. at 58-59, 105 S.Ct. at 2490-91. Of course, students already enjoy a constitutional right to voluntarily engage in silent prayer. See supra at 6-7, 21. The Court noted that § 16-1-20 did nothing to abridge this right. Jaffree, 472 U.S. at 59, 105 S.Ct. at 2491. The Court concluded, therefore, that § 16-1-20.1 was enacted to emphasize that public school students have a right to pray, and that this was not a secular purpose. See id. at 59-61, 105 S.Ct. at 2491-92.
In Ingebretsen v. Jackson Public Sch., 88 F.3d 274, the Fifth Circuit had before it a facial constitutional challenge to a statute strikingly similar to the one before this Court. The statute at issue in Ingebretsen, Miss.Code Ann. § 37-13-4.1, contained a statement of legislative purpose which was almost a verbatim copy of the statement quoted above. See § 37-13-4.1(1).[19] Nevertheless, the court found that the statute was not enacted for a secular purpose. Ingebretsen, 88 F.3d at 279. The court stated:
The legislature declared that its purpose in enacting the School Prayer Statute was `to accommodate the free exercise of religious rights of its student citizens in the public schools.' This statement of purpose cannot be characterized as `secular' because its clear intent is to inform students, teachers and school administrators that they can pray at any school event so long as a student `initiates' the prayer (ostensibly by suggesting that a prayer be given).
Id. (citation omitted). The same can be said about § 16-1-20.3 of the Alabama Code. Although the statement of purpose proclaims the statute was intended to protect "freedom of speech," the only speech which the statute "protects" is religious speech. The statute does nothing to secure students' general free speech rights. Because the statute does not further its stated purpose, the purpose may properly be disregarded. See Edwards, 482 U.S. at 586, 107 S.Ct. at 2579; see also Black Horse, 84 F.3d at 1484-85 (holding that school board policy which allowed students to decide whether to have prayer at graduation is unconstitutional, wherein court disregarded asserted secular purpose of protecting free speech rights because policy did not address students' general free speech rights at graduation and only impacted religious speech). The Court does not believe that singling out one type of speech, religious speech, and informing school officials and the public that students have an unqualified right to engage in this one type of speech, constitutes a secular purpose. Instead, by singling out religious speech, § 16-1-20.3 endorses religion. See Jaffree, 472 U.S. at 60, 105 S.Ct. at 2491-92.
The legislature's statement that § 16-1-20.3 is an effort to accommodate students' free exercise of their religious rights does not save the statute. As the Ingebretsen Court noted, informing students that they have the right to pray at any school event is not a secular purpose. 88 F.3d at 279. Furthermore, government properly "accommodates" religion only when the free exercise of religion is in some way burdened. See, e.g., *1564 Jaffree, 472 U.S. at 57 n. 45, 105 S.Ct. at 2490 n. 45; Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 348, 107 S.Ct. 2862, 2874-75, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring in judgment); Thomas v. Review Bd. of Indiana Employment Security Division, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981). Here, there has been no showing that the Free Exercise rights of the students in Alabama's public schools[20] have been burdened.[21] Therefore, the claim that § 16-1-20.3 is intended to protect students' Free Exercise rights cannot be regarded as a legitimate secular purpose. See Jaffree, 472 U.S. at 57 n. 45, 105 S.Ct. at 2490 n. 45.
Moreover, the sectarian origins of § 16-1-20.3 are revealed in a letter from the Alabama Attorney General to the law's sponsor, Representative Bill Fuller. In this letter, the Attorney General, at the behest of Rep. Fuller, evaluated the constitutionality of a draft bill with language similar to that which appears in § 16-1-20.3(b). The letter states (referring to Rep. Fuller): "You ask: What is the strongest, clearest constitutional language which Alabama might enact restoring student prayer to public schools?" Ex. A attached to Gov.'s and Atty. General's Resp. Br. on Constitutionality of Ala.Code § 16-1-20.3 (emphasis added). Restoring prayer to public schools is a patently non-secular purpose. See Jaffree, 472 U.S. at 56-60, 105 S.Ct. at 2489-92.[22]
A statute which lacks a clearly secular purpose is unconstitutional on its face. See Edwards, 482 U.S. at 594, 107 S.Ct. at 2583; Jaffree, 472 U.S. at 56-60, 105 S.Ct. at 2489-92. Here, although the Alabama legislature sought to recite a secular purpose for enacting § 16-1-20.3, the Court finds that the preeminent purpose behind the statute was to endorse religion. Accordingly, the Court finds that § 16-1-20.3 violates the Establishment Clause. See Edwards, 482 U.S. at 590-94, 107 S.Ct. at 2581-83; Jaffree, 472 U.S. at 56-61, 105 S.Ct. at 2489-92; Stone, 449 U.S. at 41-43, 101 S.Ct. at 193-95; Jager, 862 F.2d at 830; Karen B., 653 F.2d at 901.[23]
Even if § 16-1-20.3 were enacted for a wholly secular purpose, the Court would still be compelled to find the statute unconstitutional because the Court finds the primary effect of § 16-1-20.3 is to endorse religion and the Court finds that § 16-1-20.3 results in excessive entanglement between the state and religion. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111-12. Irrespective of the State's actual purpose, if legislation conveys either a message of endorsement or disapproval of religion it is unconstitutional. Jager, 862 F.2d at 831 (citing Jaffree, 472 U.S. at 56 n. 42, 105 S.Ct. at 2489 n. 42).
The effect of § 16-1-20.3(b) is to permit students to pray at school-related events, compulsory or non-compulsory, as long as the prayer is non-sectarian and non-proselytizing. The statute singles out prayer as the one form of student speech which must be *1565 permitted at these school events. Prayer is unquestionably a religious practice. Engel, 370 U.S. at 424-25, 82 S.Ct. at 1263-64; Karen B., 653 F.2d at 901 ("prayer is perhaps the quintessential religious practice for many of the world's faiths, and it plays a significant role in the devotional lives of most religious people"). It is clear, therefore, that the effect of the statute is to favor religion over non-religion, an effect which is prohibited by the Establishment Clause. C.f. Mergens, 496 U.S. at 249, 110 S.Ct. at 2371 (Equal Access Act not intended to endorse religion because "the Act on its face grants equal access to both secular and religious speech").
A second effect of § 16-1-20.3(b) is to force non-consenting students to listen to and/or participate[24] in prayer. The statute requires that prayer be permitted at school-events, including compulsory school-events.[25] Other students attending these school-events (those who do not wish to pray) will have no choice but to listen to the prayers of their peers.[26] Dissenting students will be unable to walk away, and presumably, will be unable to voice their dissent.[27] Thus, the effect of § 16-1-20.3 is to create a school system wherein public school students must, at the whim of their peers, participate in a religious practice. "It is beyond dispute that, at a minimum the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise." Lee, 505 U.S. at 587, 112 S.Ct. at 2655. It is precisely this forbidden effect which § 16-1-20.3 creates.
The foregoing analysis is not changed by the fact that under § 16-1-20.3 the students ultimately decide whether there will or will not be prayer at the referenced school-events (S 16-1-20.3(b) refers only to student-initiated prayer). See Collins v. Chandler Unified Sch. Dist., 644 F.2d 759, 760 (9th Cir.1981), cert. denied, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). A practice which tends towards the establishment of religion cannot be made secular by delegating some aspect of the practice to non-governmental actors. See Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 698-700, 114 S.Ct. 2481, 2489, 129 L.Ed.2d 546 (1994); Black Horse, 84 F.3d at 1477. The state of Alabama, by enacting a statute which gives students the absolute right to pray at compulsory student events, has sown the seeds of religious establishment. That the final step is carried out by non-governmental actors is of no consequence.
Nor is it of any significance that the statute only authorizes "non-sectarian, non-proselytizing" prayer. The Establishment Clause does more than protect against coerced indoctrination in one particular faith; as the Supreme Court has noted time and again, the Establishment Clause prevents *1566 government from favoring religion over non-religion. E.g., County of Allegheny, 492 U.S. at 591, 109 S.Ct. at 3099-3100; Aguillard, 482 U.S. at 585, 107 S.Ct. at 2578; Jaffree, 472 U.S. at 53, 105 S.Ct. at 2487-88; Committee for Public Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 771, 93 S.Ct. 2955, 2964-65, 37 L.Ed.2d 948 (1973) ("[I]t is now firmly established that a law may be one `respecting an establishment of religion' even though its consequence is not to promote a `state religion,' and even though it does not aid one religion more than another but merely benefits all religions alike.") (citations omitted); Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961) ("[Government cannot] pass laws or impose requirements which aid all religions as against non-believers."). And, while the statute may not authorize student prayer which contains a coercive element, as the Court has discussed above, any prayer in a compulsory school setting may have a forbidden coercive effect.
Finally, § 16-1-20.3 is unconstitutional because it fosters excessive entanglement between religion and the state. The operative section of the statute, subsection (b), contains ambiguous terms such as non-sectarian and non-proselytizing.[28] Since the student speech permitted by § 16-1-20.3(b) is limited to non-sectarian, non-proselytizing prayer, school officials will be forced to monitor the student prayers and decide which prayers are permissible.[29] Such action by school officials could lead impressionable schoolchildren to believe that permitted prayers are officially sanctioned. See Karen B., 653 F.2d at 902.[30]
Furthermore, the review of prayers by government officials is one of the very practices which the First Amendment was designed to prevent. The framers knew that government involvement with one's religious practices would inevitably taint the sanctity of one's faith. See Engel, 370 U.S. at 431, 82 S.Ct. at 1267. The implementation of § 16-1-20.3 will require school officials to make content-based reviews of students' prayers. The framers believed that such review posed far too great a danger to our freedom of religion. The First Amendment prevents Alabama school officials from taking the very action which implementing § 16-1-20.3 would require.
In addition to monitoring the content of the student prayers, implementing § 16-1-20.3 will force school officials to monitor the conduct of dissenting students. If the guarantee of § 16-1-20.3(b) is to be given effect, school officials will have to prevent dissenting students from interfering with students who exercise their right to pray. This need to continually monitor both the content of the prayers and the conduct of dissenting students results in "excessive and enduring entanglements between state and church" *1567 which is forbidden by the Establishment Clause. Lemon, 403 U.S. at 619, 91 S.Ct. at 2114.
Thus, the Court finds that § 16-1-20.3 is unconstitutional because it (1) unreasonably restricts the private speech and religion rights of public school students; (2) was not enacted for a secular purpose; (3) has the primary effect of endorsing religion; (4) has the further effect of coercing public school students to participate in religious activity; and (5) creates excessive entanglement between religion and the state by forcing school officials to continually monitor both the content of prayer and the conduct of dissenting students. Nevertheless, the defendants urge the Court to give the statute a "narrowing construction" such that the statute is saved. In the alternative, the defendants assert that the Court should sever any portion of the statute which is unconstitutional leaving the remainder intact. Neither of these suggestions is tenable.
The defendants cite United States v. Salerno, 481 U.S. 739, 744, 107 S.Ct. 2095, 2099-2100, 95 L.Ed.2d 697 (1987), for the proposition that a reviewing court must uphold the constitutionality of a statute challenged on its face unless there is no set of circumstances under which the statute may be constitutionally applied. Salerno involved a facial challenge to the Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq. Id. at 741, 107 S.Ct. at 2098. The Court stated that to successfully mount a facial challenge to the Act, the plaintiff had to establish that "no set of circumstances exist under which the Act would be valid." Id. at 745, 107 S.Ct. at 2100. However, the Court was careful to note that the case was not one which involved a challenge under the First Amendment. Id.
The Court does not apply the onerous Salerno test when a statute is challenged on its face as being contrary to the First Amendment. Instead, when a statute is challenged as violative of the Establishment Clause, the Court "assess[es] the constitutionality of an enactment by reference to the three factors first articulated in Lemon v. Kurtzman." Bowen v. Kendrick, 487 U.S. 589, 602, 108 S.Ct. 2562, 2570-71, 101 L.Ed.2d 520 (1988). When a statute is challenged under the Establishment Clause, the Court makes no distinction between a "facial" and an "as-applied" challenge. Id. at 600-01, 108 S.Ct. at 2569-70. Therefore, the inquiry in Salerno, whether there is any set of circumstances under which the statute could be constitutionally applied, is not relevant to the instant case. The standard to be applied is that set forth in Lemon, a task which the Court has undertaken above.[31]
The Court's analysis under Lemon, above, leads the Court to find that the statute cannot be saved by means of severing those portions of the statute which are unconstitutional. The Court has found that in enacting § 16-1-20.3 the Alabama legislature lacked a secular purpose. Because the statute as a whole is an effort to instill prayer in Alabama public schools, the statute as a whole is unconstitutional. See Jaffree, 472 U.S. at 61, 105 S.Ct. at 2492; Ingebretsen, 88 F.3d at 279. Moreover subsection (b) of the statute is the only operative portion of the statute. As discussed above, the effect of this subsection is to endorse religion and create excessive entanglement between the state and religion. Subsection (b), therefore, is plainly unconstitutional. The other subsections *1568 in § 16-1-20.3, subsections (a)[32], (c)[33] and (d)[34], clearly have no purpose other than to qualify subsection (b). Therefore, if subsection (b) is severed, the remaining subsections become meaningless. The Alabama legislature surely did not intend to enact a meaningless statute. See Jaffree, 472 U.S. at 59, 105 S.Ct. at 2491. Accordingly, the Court finds that the entire statute must be stricken as unconstitutional.
By enacting § 16-1-20.3, the Alabama legislature sought to return prayer to the State's public schools. However, one need not "return" something which was never absent. The Constitution guarantees that public school students have the right to "freedom of religion," and "freedom of speech." Under most circumstances, public school students have the right to engage in private religious speech of any type. Therein lies the great irony of § 16-1-20.3. The statute is unconstitutional because it unreasonably restricts the free speech and religion rights of Alabama's public school students.
The Constitution gives the people of Alabama the right to freely exercise their religious beliefs. The Constitution also guarantees that the State of Alabama cannot establish or endorse religion. It is the duty of this and every other court to uphold these rights if and when they are infringed. Here, the state of Alabama has infringed upon them both. Accordingly, Ala.Code § 16-1-20.3 is due to be stricken. It is as true now as when first stated by the late Mr. Justice Frankfurter, "[i]f nowhere else, in the relation between Church and State, `good fences make good neighbors.'" People of State of Ill. ex rel. McCollum v. Board of Educ., 333 U.S. 203, 232, 68 S.Ct. 461, 475, 92 L.Ed. 649 (1948).

ORDER
For all of the foregoing reasons, it is CONSIDERED and ORDERED that plaintiff's motion for summary judgment on the constitutionality of Ala.Code § 16-1-20.3 be and the same is hereby GRANTED. The Court finds that § 16-1-20.3 is unconstitutional in that it violates the mandates of the First Amendment to the United States Constitution as interpreted by the United States Supreme Court and the Court of Appeals for the Eleventh Circuit.
It is further CONSIDERED and ORDERED that in light of this Memorandum Opinion, the plaintiff and the "Dekalb County defendants," within 15 days of the receipt of this Memorandum Opinion and Order, be and the same are hereby DIRECTED to engage in settlement negotiations and report to the Court the results thereof.
It is further CONSIDERED and ORDERED that the United States Marshall personally serve courtesy copies of this Memorandum Opinion and Order on:
(1) Honorable Forrest H. "Fob" James, Governor of Alabama;
(2) Honorable Don Siegelman, Lieutenant Governor of Alabama;
(3) Honorable James S. Clark, Speaker of the House of Representatives of Alabama;
(4) Honorable William H. Pryor, Jr., Attorney General of Alabama;
(5) Honorable Ed Richardson, Superintendent of Education of Alabama; and
(6) Honorable William P. Gray, Jr., legal advisor to Governor James.
NOTES
[1] The Court is keenly aware that the First Amendment directs that "Congress shall make no law ..." U.S. Const. amend. I (emphasis added). However, the Supreme Court has held that the guarantees of the First Amendment, through the Fourteenth Amendment, are equally applicable as against the states. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).
[2] The Court's decision in Barnette did not rest solely on the appellant's assertion of Free Exercise rights, but turned on principles guiding the First Amendment as a whole.
[3] While the Court uses this example merely to illustrate its point, this hypothetical principle could very well exist in reality. In the words of the late Mr. Justice Jackson, "in our country are evangelists and zealots of many different political, economic and religious persuasions whose fanatical conviction is that all thought is divinely classified into two kindsthat which is their own and that which is false and dangerous." American Communications Assn. v. Douds, 339 U.S. 382, 438, 70 S.Ct. 674, 704, 94 L.Ed. 925 (1950) (Jackson, J. concurring in part and dissenting in part).
[4] The defendants assert that Jones is the "first and leading case on this type of issue." Gov.'s and Atty. General's Resp. Br. on Constitutionality of § 16-1-20.3. Jones, however, is not controlling precedent in this circuit, is of limited relevance to the instant case, and rests on questionable legal conclusions.

In Jones v. Clear Creek Independent School Dist., the Fifth Circuit held that a resolution permitting high school seniors to choose student volunteers to deliver nonsectarian, nonproselytizing prayers at graduation ceremonies, was constitutional. 930 F.2d 416 (5th Cir.1991). The Supreme Court vacated that decision in light of its decision in Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). On remand, the Fifth Circuit again held the resolution was constitutional. 977 F.2d 963 (5th Cir.1992) (Jones II). Thereafter, the Supreme Court denied certiorari. 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993).
The statute at issue in the instant case is far broader than a resolution permitting voluntary prayer at a high school graduation. First, § 16-1-20.3 is not limited to high schools, it appears to apply equally to all public schools from kindergarten through twelfth grade. The court in Jones II based its decision in part on the contention that, "graduating high school seniors would be less easily influenced by prayer than would their junior schoolmates." 977 F.2d at 967. The court went on to state that it considers "the age of the graduating seniors relevant to the determination of whether prayers under the Resolution can coerce these young people into participating in a religious exercise." Id. at 971. The statute at issue here applies to those "junior schoolmates," and thus, the potential coercive effect is much greater than that of the resolution at issue in Jones II.
Second, § 16-1-20.3 is not limited to high school graduations as was the resolution in Jones II. Under the terms of the statute here, students would be permitted to engage in the type of activity approved of in Jones II at all "compulsory or non-compulsory.. school-related student events." § 16-1-20.3(b). It is clear that the court's reasoning in Jones II was limited to the high school graduation context. Id. at 966 (holding resolution serves a secular purpose because "meaningful graduation can provide encouragement to finish school and the inspiration and self-assurance necessary to achieve after graduation"). Indeed, subsequent decisions from the Fifth Circuit make it clear that the holding in Jones II is limited to the context of a high school graduation. See Doe v. Duncanville Ind. Sch. Dist., 70 F.3d 402, 406 (5th Cir.1995) (holding unconstitutional practice which permitted basketball coach to supervise and participate in team prayers held at games and practices); Ingebretsen v. Jackson Public Sch. Dist., 88 F.3d 274, 279-80 (5th Cir.1996) (holding unconstitutional a state statute which permitted student-initiated nonsectarian, nonproselytizing prayer at school-related events, but noting that statute could stand in context of high school graduation).
Finally, despite the defendants' contention, the Court notes that Jones II appears to be an aberrational case rather than the "leading case on this type of issue." See Alexander Tanford, The Death of Graduation Prayer: The Parrot Sketch Redux, 24 J.L. & Educ. 423, 426-33 (1995). With all due respect, the Court believes that the decision in Jones II is a departure from established Supreme Court precedent. See Harris v. Joint Sch. Dist. No. 241, 41 F.3d 447, 454-57 (9th Cir.1994), vacated as moot, ___ U.S. ____, 115 S.Ct. 2604, 132 L.Ed.2d 849 (1995); Tanford, supra at 447-54. Furthermore, the decision in Jones II is inconsistent with controlling Eleventh Circuit precedent. See e.g. Jager, 862 F.2d at 824. The Court is bound by Eleventh Circuit precedent, and therefore, the Court cannot follow the reasoning set forth in the Jones II decision.
[5] A "secular" purpose is one which "relat[es] to the worldly or temporal as distinguished from the spiritual or eternal." Webster's Third New International Dictionary, 2053 (1961).
[6] Although Lemon has been the subject of considerable criticism, see, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 396-400, 113 S.Ct. 2141, 2149-50, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in judgment), it has not been overruled and is unquestionably the law in this circuit. See, e.g., Chabad-Lubavitch of Georgia v. Miller, 5 F.3d 1383, 1388 (11th Cir.1993); Jager, 862 F.2d at 828.
[7] "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I.
[8] "Public forum" analysis involves determining whether a location, by tradition or government fiat, is dedicated to assembly, debate or expressive activity. See Perry Educ. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-56, 74 L.Ed.2d 794 (1983). If so, "the rights of the State to limit expressive activity are sharply circumscribed." Id. at 45, 103 S.Ct. at 954.
[9] "Sectarian" religious speech is that which is "confined to the limits of one religious group, one school, or one party." Webster's Third New International Dictionary, 2052 (1961).
[10] "Proselytizing" religious speech is that which is intended to "convert [another] from one religion, belief, opinion, or party to another." Webster's Third New International Dictionary, 1821 (1961).
[11] In whole, subsection (b) provides:

On public school, other public, or other property, non-sectarian, non-proselytizing student-initiated voluntary prayer, invocation and/or benedictions, shall be permitted during compulsory or non-compulsory school-related student assemblies, school-related student sporting events, school-related graduation or commencement ceremonies, and other school-related student events.
Ala.Code § 16-1-20.3(b) (1995).
In whole, subsection (c) provides:
Nothing in this section shall otherwise diminish the right of any student or person to exercise his or her rights of free speech and religion, including prayer, as permitted by the United States Constitution and the Alabama Constitution on public school or other public property, or other property, at times or events other than those stated in subsection (b).
Ala.Code § 16-1-20.3(c) (1995).
[12] The state of Alabama may have been justified by limiting its public school students' free speech and religion rights, see Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163-64, 92 L.Ed.2d 549 (1986) (holding students in school have limited free speech rights); New Jersey v. T.L.O., 469 U.S. 325, 337-41, 105 S.Ct. 733, 740-43, 83 L.Ed.2d 720 (1985) (holding students in school have limited rights under the Fourth Amendment), but the state has failed to present any reason for this limitation on its public school students' rights. Nevertheless, the Court does not rest its finding that § 16-1-20.3 is unconstitutional on this basis alone. As will be demonstrated in the discussion below, the statute is unconstitutional for a number of reasons.
[13] The Court doubts whether religious speech can truly be "non-sectarian;" while some prayers are undoubtedly general in nature, all would seem to be imbued with some elements of the speaker's faith. See Schempp, 374 U.S. at 282-86, 83 S.Ct. at 1603-05 (Brennan J., concurring).
[14] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).
[15] The Court notes that public schools are not traditional public fora. See, e.g., Lamb's Chapel v. Center Moriches Union Sch. Dist. 508 U.S. at 392, 113 S.Ct. at 2146-47; Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. at 267, 108 S.Ct. at 567-68.
[16] The Court would distinguish the above-described situations from those periods during which students are "in school" or attending a school-event but school officials exercise minimal supervisory control and students are free to move about as they please. During these latter times, e.g., in between classes or lunch (depending on the factual circumstances), the restrictions on students' free speech rights are limited; students should be able to engage in sectarian, proselytizing, religious speech as long as it is not, for reasons other than its content, disruptive (e.g., it is loud, the speaker is aggressive, etc.).
[17] This list is exemplary only; it is by no means intended to be a complete statement of permissible religious expression by public school students.
[18] The "Equal Access Act," 20 U.S.C. § 4071(a), makes it unlawful for any public secondary school which receives federal financial assistance and which has created a limited public forum to deny access or discriminate against students who wish to conduct a meeting in that limited public forum on the basis of religious, political, philosophical, or other speech content. The Act contains a number of qualifications and emphasizes that official involvement in the student meetings must be non-participatory and strictly limited. See 20 U.S.C. §§ 4071(c) and (d).
[19] Section 37-13-4.1(1) provides:

The legislative intent and purpose for this section is to protect the freedom of speech guaranteed by the First Amendment to the United States constitution, to define for the citizens of Mississippi the rights and privileges that are accorded them on public school property, other public property or other property at school-related events; and to provide guidance to public school officials on the rights and requirements of law that they must apply. The intent and purpose of the Legislature is to accommodate the free exercise of religious rights of its student citizens in the public schools and at public school events as provided to them by the First Amendment to the United States Constitution and the judicial interpretations thereof as given by the United States Supreme Court.
[20] As noted earlier, the Court stands ready, willing and able to protect these rights when and if they are impinged. See supra pp. 18-19.
[21] The only "burden" on students' free exercise rights which the Court can discern is that imposed by the Establishment Clause. However, this is a "burden" which the state of Alabama cannot remove. Jaffree, 472 U.S. at 83-84, 105 S.Ct. at 2503-04 (O'Connor, J., concurring).
[22] The Court recognizes that a statement of purpose by one legislator is not equivalent to a statement of legislative purpose. See Mergens, 496 U.S. at 249, 110 S.Ct. at 2371. Nonetheless, the Court finds a statement of purpose made by the sponsor of § 16-1-20.3, which was submitted to the Court by the defendant, to be relevant to the question of legislative purpose.
[23] The instant case is distinguishable from Bown v. Gwinnett County Sch. Dist., 895 F.Supp. 1564 (N.D.Ga.1995), where the court found that a statute which provided for a moment of silence at the beginning of the school day, was enacted for a secular purpose. Setting aside a moment of silence so that students can reflect on the anticipated activities of the day is, arguably, a secular purpose. See Jaffree, 472 U.S. at 72-73, 105 S.Ct. at 2498-99; but see Gilbert A. Holmes, Student Religious Expression in School: Is it Religion or Speech. and Does it Matter, 49 U. Miami L. Rev 377, 411 n. 202, 412 n. 208 (1994) ("moments of silence serve a reverent purpose"). The statute at issue in Bown clearly served that purpose. See Ga.Code Ann. § 20-2-1050(a). In the instant case, § 16-1-20.3 does not serve the asserted secular purpose for which it was enacted, to protect students' free speech rights. Therefore, in the instant case, unlike Bown, the legislature's asserted secular purpose does not control the Court's inquiry.
[24] Students are not compelled under § 16-1-20.3(b) to verbally join their peers when they choose to pray at a "school-related" event. However, at a compulsory event, a student who did not wish to pray would have no choice but to remain and listen to his or her peers' prayers. Because the statute gives students the absolute right to pray at such events, a dissenting student could not protest another student's prayer. Unable to interfere with the absolute prayer right provided in the statute, the dissenting student would have to remain silent, while his or her peers, perhaps a majority of his or her peers, prayed. In the face of such prayer, a student who remains silent may very well feel as though he or she has participated in the religious activity by acquiescence. See Lee, 505 U.S. at 593, 112 S.Ct. at 2658-59. Regardless of whether the dissenter is characterized as "participating" in the prayer, a student is injured whenever the machinery of the state is used to force the dissenter to listen to prayer. See id.
[25] The Court notes that students may be functionally compelled to attend school-events even when these events are not technically compulsory. See Lee, 505 U.S. at 593-95, 112 S.Ct. at 2658-60.
[26] Indeed, § 16-1-20.3 does not contain the seemingly obligatory "opt-out" provision which frequently appears in this type of legislation. See, e.g., Schempp, 374 U.S. at 205, 83 S.Ct. at 1562; Engel, 370 U.S. at 423, 82 S.Ct. at 1263.
[27] Section 16-1-20.2 does not provide dissenting students with the right to verbally object to prayers offered at these school-related events. Moreover, since the statute mandates that students have the right to pray, school officials might find it necessary to silence a dissenting student who interfered with this prayer right. The effect of such action would clearly be an endorsement of religion. See Ball, 473 U.S. at 389, 105 S.Ct. at 3225 (government promotes religion when it fosters a close identification between its powers and religion).
[28] Contrary to defendants' assertion, the mere fact that the Supreme Court has uttered these words does not render them "safe to use in statutory form without fear of ambiguity." Gov. and Atty. General's Br. in Resp. to Pl.'s Mot. for Summ. J. on Constitutionality of § 16-1-20.3 at 23. The Court has not defined these words such that reasonable students who choose to pray and reasonable officials who must monitor those prayers could readily agree on their definition. Ironically, in Lee v. Weisman, to insure the "nonsectarian" nature of a graduation prayer, the school principal had to provide the clergyman selected to deliver the prayer with written guidelines on what would constitute a nonsectarian prayer. 505 U.S. at 588, 112 S.Ct. at 2656. It was, in part, the principal's provision of those guidelines which led the Court to declare the graduation prayers unconstitutional. Id.
[29] The Court notes that this task would be a difficult one. School officials may be no better able to identify "non-sectarian, non-proselytizing" prayers than the students making them. The task would be even more difficult where the official making the decision was unfamiliar with the prayer and religion in question. The resultant potential for inconsistent rules and favoritism among religions is further reason to question the statute.
[30] Like the Mississippi statute before the Ingebretsen Court, § 16-1-20.3 contains a number of ambiguities. In addition to those discussed above, the statute does not define "school-related events," nor does it define "student-initiated" prayer. This latter ambiguity is particularly troublesome as it could be construed to allow students to authorize third parties, such as clergymen or school officials, to deliver prayers in the public schools. See Ingebretsen, 88 F.3d at 280; Ingebretsen v. Jackson Public Sch. Dist., 864 F.Supp. 1473, 1483 (S.D.Miss.1994). This, of course, is an activity which has been expressly forbidden by the Supreme Court. E.g., Lee, 505 U.S. at 599, 112 S.Ct. at 2661-62; Schempp, 374 U.S. at 223, 83 S.Ct. at 1572.
[31] Assuming arguendo that the Court is bound to construe the statute to be constitutional if possible, the statute would still fail to survive the Court's review. Nothing short of completely rewriting the operative portion of the statute, subsection (b), will make the statute constitutional. This is a task which the Court will not undertake. See Chapman v. United States, 500 U.S. 453, 464, 111 S.Ct. 1919, 1926-27, 114 L.Ed.2d 524 (1991).

Section 16-1-20.3(b) provides that students shall be permitted to engage in non-sectarian, non-proselytizing prayer at compulsory and non-compulsory school-related student events. As the Court's previous discussion demonstrates, under the dictates of the Establishment Clause and Supreme Court decisions, students do not have an absolute right to engage in such prayer. While the defendants argue that the statute does no more than recognize students' free exercise and free speech rights, the Court will not ignore the plain meaning of the statute. The United States Constitution reflects the fact that students have free exercise and free speech rights; section 16-1-20.3 both impinges these rights and authorizes religious activity in our public schools which is plainly unconstitutional.
[32] The text of this subsection was fully quoted on page 24, supra.
[33] The text of this subsection was fully quoted on page 17 n. 12, supra.
[34] This subsection provides:

The exercise of these rights on public school or other public property, or on other property for school-related activities, by students or others, shall not be construed to indicate any support, approval, or sanction by the State of Alabama, any political subdivision thereof, municipal corporation, governmental entity of any description, or any agent or employee of any governmental entity of the contents of any such prayer, invocation, benediction, or other activity, or be an unconstitutional use of any public school property or other public property, or be the promotion or establishment of any religion or religious belief.
Ala.Code § 16-1-20.3(d) (1995).